UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES DARNELL JACKSON, as Personal
Representative of the Estate of Doyle M.
Jackson, Deceased,

        Plaintiff,

        File No. 1:09-CV-553

v.

HON. ROBERT HOLMES BELL

BENTON HARBOR POLICE OFFICER JIM
WILKINS, et al.,

        Defendants.
                                                 /

## **O P I N I O N**

        This is an action by decedent Doyle M. Jackson's estate to obtain damages. Doyle Jackson died from internal injuries sustained while evading arrest by Benton Harbor police officers. Those injuries progressed while Jackson was held at the Berrien County Jail.

        There are three motions for summary judgment before the Court, one for each of three groups of defendants. This opinion addresses the motion for summary judgment filed by Defendants Medic 1 Ambulance, Inc., Paramedic John VanHare, and EMT Jesse Peterson ("Medic 1 Defendants"). (Dkt. No. 95.) The pending motions for summary judgment filed by Berrien County Defendants[1] (Dkt. No. 115) and Benton Harbor Defendants[2] (Dkt. No.

---

[1] Defendants Berrien County, Sheriff L. Paul Bailey, Perry Bundy, Lt. Brian Wilkey, Deputy Jason Uhrik, Deputy Ron Uhrik, and Nurse Mark Haueisen.

[2] Defendants City of Benton Harbor, Benton Harbor Police Officer Jim Wilkins, Officer Dustin Blaskie, Officer Preston Alsup, and Police Chief Al Mingo.

120) will be addressed in a separate forthcoming opinion.

Six of the ten counts in Plaintiff's complaint apply to the Medic 1 defendants: violation of constitutional rights actionable under 42 U.S.C. 1983 (Counts I and IX); violation of 42 U.S.C. § 1985(3) (Count II); intentional infliction of emotional distress (Count IV); gross negligence (Count VI); wrongful death/survival (Count X). Plaintiff has voluntarily moved to dismiss Count II. (Dkt. No. 106 at 16.) For the reasons that follow, the Court will grant Medic One Defendants' motion for summary judgment with respect to the remaining claims.

## I. Background

At approximately 4:00 a.m. on May 29, 2007, Benton Harbor police were dispatched to the residence of Imogene Wade. Ms. Wade had called the police after Jackson had physically assaulted her and locked her out of her house. Benton Harbor Police Officers Dustin Blaskie and Jim Wilkins arrived at the scene. Officer Wilkins heard Ms. Wade yell that Jackson was stealing her vehicle. Jackson began to exit the driveway in the vehicle, and Officer Wilkins attempted to block him with his patrol vehicle. Jackson was able to maneuver past Wilkins' vehicle, and the officers began to pursue Jackson. Jackson eventually lost control of his vehicle and slammed into a curb.

Jackson then exited the vehicle; it is disputed whether or not he had his hands up. Officer Wilkins approached Jackson with gun drawn and shouted verbal commands at Jackson to get on the ground. Jackson did not comply and approached Officer Wilkins. At

this point, Officer Wilkins claims that Jackson tried to grab his gun and shoved him. Plaintiff claims that Jackson did not go for Wilkins' gun and that Wilkins took an unprovoked swing at him. Video footage from Officer Wilkins' vehicle camera covers the car chase and this incident, though the parties interpret the footage differently. At any rate, Jackson began to flee once again after coming into contact with Officer Wilkins, this time on foot.

Officer Blaskie, now also on foot, closed to approximately 15-20 feet behind the fleeing Jackson, and then fired his Taser. Blaskie is unsure whether one, both, or neither of the Taser prongs made contact with Jackson. However, nearly simultaneously with the Taser discharge, Jackson hit the side of a dumpster with enough force to cause a "back flip." (Dkt. No 132 at 3.) Plaintiff alleges that Jackson was "propelled" into the dumpster protrusion by the shock of Officer Blaskie's Taser. (*Id.* at 3-4.) After making contact with the dumpster, Jackson got up and once again began running.

Soon after, Officer Blaskie caught Jackson and attempted to drive stun him.[3] Then Officer Wilkins arrived. Plaintiff and Defendants present differing accounts of the struggle that took place. What is undisputed is that Blaskie at least attempted to drive stun Jackson, that Wilkins struck Jackson with several blows,[4] and that Wilkins then fired his Taser while

---

[3] A "drive stun" involves placing a Taser directly against a target rather than firing the Taser's projectiles. Drive stuns generally cause pain without incapacitating the target.

[4] Defendants maintain that the officers used peroneal knee kicks and brachial punches, which are blows designed to temporarily incapacitate an opponent. (Dkt. No. 120 at 4.) Plaintiff insinuates that the blows may have been more savage and could be responsible for the testicular contusion discovered at Jackson's autopsy. (Dkt. No. 132 at 4.)

3

Jackson was on his hands and knees trying to get up. (Dkt. No. 120 at 4; Dkt. No. 132 at 4.) The Officers claim that Jackson was very strong, and resisted intensely until he was finally subdued by several pulses from Wilkins' Taser. Plaintiff argues that the officers used excessive force against an unarmed man who was down.

Officer Preston Alsup soon arrived on the scene. The Officers placed Jackson in Alsup's patrol car. They noted that Jackson did not appear able to walk on his own, and that he had scrapes and a bruise on his chest. Defendants claim that the officers asked Jackson if he wanted to go to a hospital, and that Jackson declined. The Officers then transferred Jackson to Officer Wilkins' patrol vehicle and searched the Wade vehicle for weapons or contraband. The Officers drove Jackson to the Berrien County Jail.

En route to the jail, Jackson defecated in Wilkins' vehicle. He also appeared lethargic upon arrival at the Jail at 5:06 AM. He had to be carried/dragged to his cell, and asked to be placed on a toilet. The Berrien County deputies who moved Jackson claim that they interpreted Jackson's failure to walk on his own power as typical drunken and unruly behavior. (Dkt. No. 116 at 4.)

For the better part of an hour, Jackson alternated between sitting on the cell toilet and lying on the floor. (*Id.* at 4-5.) During this time, Berrien County deputies and Nurse Mark Haueisen checked on Jackson sporadically. (*Id.*) Also during this time, Jackson vomited and defecated while off the toilet.

Upon suggestion that Jackson be taken to the showers to clean up, Nurse Haueisen

4

entered Jackson's cell to help clean up and perform a medical assessment at 6:13 AM. Nurse Haueisen used smelling salts in an attempt to revive Jackson, and determined that Jackson was less responsive than at arrival. Nurse Hausen and Lt. Wilkey exited Jackson's cell at 6:19, and placed a call to Medic One for an ambulance at 6:23. (*Id.* at 6.) It is undisputed that Nurse Haueisen did not perform an assessment of Jackson between 5:06 AM, when Jackson arrived, and 6:13, when he was found unresponsive.

A Medic One ambulance manned by Paramedic John VanHare and EMT Jessy Peterson arrived at the Berrien County Jail at 6:29 and reached Jackson's cell at 6:33. (Dkt. No. 95 at 6.) Jackson was placed on a gurney and transported to the ambulance waiting at the sally port. He was placed into the ambulance at 6:42. (Dkt. No. 106 at 3.) However, the ambulance did not leave the sally port until 7:13, a full half hour after Jackson was placed in the vehicle. (*Id.*) The Medic One defendants provided medical assistance during this period, including administration of an "Ambu-bag" to ventilate Jackson, placement on an EKG, and medication to treat "pulseless electrical activity" in Jackson's heart. When the ambulance left for the hospital at 7:13, VanHare and Peterson had a Berrien County deputy drive the vehicle so that they could continue to work on Jackson.

Jackson arrived at Lakeland hospital at 7:18 AM. He was pronounced dead at 9:40 AM. Cause of death was a lacerated liver, presumably the result of Jackson's collision with a dumpster during his flight from the Benton Harbor police.

5

## II. Standard of Review

Summary judgment is appropriate when the evidence submitted shows that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Id. Accordingly, the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying what it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp v Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary judgment is properly made and supported, an opposing party must set out specific facts showing a genuine issue for trial. Fed R Civ P 56(e). All facts and inferences should be viewed in the light most favorable to the nonmoving party. *Adickes v SH Kress & Co*, 398 U.S. 144, 158-59 (1970). This court may dismiss Plaintiff's complaint only if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings. *Cooper v Parrish*, 203 F.3d 937, 944 (6th Cir 2000).

If Plaintiff demonstrates the existence of a genuine issue of fact, the Court must determine whether that fact is material. The Court must consider a disputed fact material and deny summary judgment when, in light of the law of the case, that fact is outcome determinative. *Sova v City of Mount Pleasant*, 142 F3d 898, 903 (6th Cir 1998) ("Where . . . the legal question of qualified immunity turns upon which version of the facts one accepts,

the jury, not the judge, must determine liability."); *Bouggess v Mattingly*, 482 F3d 886, 888 (6th Cir. 2007). In contrast, if a disputed fact has no bearing on the outcome of the case, it is not material and will not preclude summary judgment.

### III. Discussion

#### A. Constitutional Claims

Plaintiff claims that Medic 1 Defendants violated his due process rights by failing to provide timely medical care. The alleged violations of Plaintiff's constitutional rights are actionable under 42 U.S.C. § 1983 if Plaintiff can show that the Medic 1 Defendants caused the deprivation while acting under color of state law. *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000); *Baker v. Hadley*, 167 F.3d 1014, 1017 (6th Cir. 1999); *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir. 1997). Here, it is not disputed that Medic 1 Defendants are a governmental entity acting under color of state law. (Dkt. No. 95 at 9.)

However, Plaintiff has failed to allege a violation of a viable federal right with respect to the Medic 1 Defendants. There is no recognized constitutional claim for "timely medical care" giving rise to a due process violation. *Jackson v. Shultz*, 429 F.3d 586, 589 (2005). Thus, the state's failure to provide medical assistance or provision of incompetent medical assistance does not generally constitute a constitutional violation. There are two recognized exceptions: the custody exception, and the state-created danger exception. *Id.* Neither is applicable to Plaintiff with respect to Medic 1 Defendants.

Despite Plaintiff's argument to the contrary, the state-created danger exception clearly does not apply to Medic 1 Defendants. Liability under this exception only exists where the defendant state actor takes some affirmative action to create or increase a plaintiff's risk of harm. Here, Plaintiff acknowledges that Doyle Jackson was in dire straights before the arrival of Medic 1 Defendants, and that he died from an injury sustained while evading police. There is no allegation that any affirmative action by Medic 1 Defendants in any way created a danger to Jackson. It also cannot be said that Medic 1 Defendants *affirmatively acted* to increase the danger to Jackson. Failing to immediately transport Jackson to a hospital was not an affirmative act. Even if, as Plaintiff argues, Medic 1 Defendants were deliberately indifferent to Jackson's medical needs by electing not to immediately transport Jackson, that is of no constitutional import without a prior showing that Medic 1 Defendants had taken some kind of prior affirmative action placing Jackson at increased risk.

Plaintiff also cannot avail himself of the custody exception with respect to the Medic 1 Defendants. Although the state does have a duty to provide adequate medical care to incarcerated prisoners and pre-trial detainees, *Jackson*, 429 F.3d at 589, this obligation only attaches to the entity which has taken an individual into custody. "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Deshaney v Winnebago County Dep't of Social Services*, 489 US 189, 199-200 (1989). But "custody" involves "restraints of personal liberty" requiring "some state action that applies

8

force (or threat of force) and show of authority made with the intent of acquiring physical control." *Jackson*, 429 F.3d at 590. "[T]he overarching prerequisite for custody is an affirmative act by the state that restrains the ability of an individual to act on his own behalf." *Baker v. City of Detroit*, 217 Fed. Appx. 491 (6th Cir. 2007). Here, Doyle Jackson's "personal liberty" was not restrained by Medic 1 Defendants. Although Jackson was unable to care for himself due to his medical state, there is no affirmative action by Medic 1 Defendants applying force or threat of force to acquire physical control of Jackson. That was done initially by the Benton Harbor Defendants and later by the Berrien County Defendants. Accordingly, Jackson was not in the "custody" of the Medic 1 Defendants, and Plaintiff may not rely on the custody exception with respect to these defendants.

Furthermore, even if Plaintiff could establish that Medic 1 Defendants had a constitutional duty to provide Jackson with timely medical care, Plaintiff has not met his burden of showing that Medic 1 Defendants acted with deliberate indifference. To establish a cognizable constitutional claim for failure to provide adequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The "deliberate indifference" standard has both an objective and a subjective component. *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005). The objective component of a claim of deliberate indifference requires a medical need that is "sufficiently serious." *Id.* (citing *Farmer v Brennan*, 511 U.S. 825, 834 (1994)). Clearly, the circumstances of this case satisfy that

9

prong. However, the subjective standard requires Plaintiff to allege facts showing that a defendant subjectively perceived facts from which to infer a substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). As Plaintiff acknowledges, this test is "onerous." *Id.*; (Dkt. No. 106 at 13).

> Plaintiff alleges that Defendants John VanHare and Jessy Peterson were
>
>> "deliberately indifferent to [Doyle Jackson's] serious medical needs . . . by recklessly disregarding a substantial risk of serious harm to Doyle M. Jackson," thereby causing his wrongful death' when they denied him immediate treatment at the jail, and instead, "wheeled Plaintiff out of the jail and into the sally port where they placed Plaintiff in the ambulance; and then, just sat in the sally port for over thirty minutes without transporting Plaintiff to the hospital."

(Dkt. No. 106 at 14 (internal citations omitted).) However, Plaintiff has provided no basis for this allegation. It is clear that VanHare and Peterson remained with Jackson in the Sally Port for some thirty minutes prior to departing for a hospital, but the Medic 1 Defendants' uncontested testimony is that VanHare and Peterson were administering medical care during that time. The Medic 1 EMT and paramedic testified that they took note of Jackson's condition, found that he was either minimally breathing or not breathing, began to use an "Ambu-bag" to ventilate Jackson, performed CPR, intubated Jackson, placed him on a heart monitor, determined that Jackson had "pulseless electrical activity," and administered IV medication to treat that condition. (Dkt. No. 95 at 6-7.) When Jackson's blood pressure was briefly regained following this treatment, the ambulance departed for the hospital. (*Id.* at 7.)

Plaintiff did not contest Medic 1 Defendants' account of treatment provided to Jackson in the sally port either in his brief or at oral argument. Instead, Plaintiff forcefully argues that the only reasonable treatment for a person in Doyle Jackson's condition was immediate transport to the nearest hospital, and then jumps to the position that Defendants were simply not providing care during the thirty minutes spent in the sally port. This is not enough to satisfy the subjective prong of the "deliberate indifference" analysis.

Plaintiff's disagreement with VanHare and Peterson's priorities and decisions in providing treatment to Jackson does not provide a basis for finding that the Medic 1 Defendants disregarded any risk to Jackson. Even if the treatment decisions made by VanHare and Peterson were incorrect, Plaintiff simply has not shown that Medic 1 Defendants were deliberately indifferent to Jackson's medical needs. Accordingly, even if Medic 1 Defendants had a constitutional obligation to provide adequate medical care, they would still be entitled to summary judgment.

**B. State Law Claims**

In addition to his constitutional claims, Plaintiff seeks damages under state tort law claims of intentional infliction of emotional distress, gross negligence, and wrongful death. Because these claims sound in medical malpractice, and because Plaintiff did not comply with M.C.L. 600.2912b, Defendants are also entitled to summary judgment on Plaintiff's tort claims.

In Michigan, a potential medical malpractice plaintiff must serve a "notice of intent"

11

on prospective Defendants prior to the filing of a complaint:

> Except as otherwise provided in this section, a person shall not commence an action alleging medical malpractice against a health professional or health facility unless the person has given the health professional or health facility written notice under this section not less than 182 days before the action is commenced.

M.C.L. 600.2912b(1). In addition, M.C.L. 600.2912d requires a plaintiff in a medical malpractice action to file an "affidavit of merit" with the complaint and states, in pertinent part: "Plaintiff in an action alleging medical malpractice shall file with the complaint an affidavit of merit signed by a health professional who . . . meets the requirements for an expert witness under section 2169."

Plaintiff has not complied with either statutory requirement in filing this action. Instead, Plaintiff argues that he is not required to comply with the provisions of M.C.L. 600.2912 because he has framed this suit as a violation of his constitutional rights under the "deliberate indifference" standard. (Dkt. No. 106 at 9.) That argument would be responsive to an attack on Plaintiff's § 1983 claims, but not to a challenge of his state tort claims. As Plaintiff himself notes, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Gamble*, 429 U.S. at 106.

Plaintiff's state law claims fit squarely within the realm of medical malpractice. The Michigan Supreme Court has held that the key to identifying a medical malpractice claim is whether the claim alleges that the negligence occurred within the course of a professional relationship, and that the procedural requirements of a medical malpractice claim should

12

apply when the alleged facts raise issues that are beyond the common knowledge or experience of the jury or, alternatively, raise questions involving medical judgment. *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 45-46 (1999). Here, the individual Medic 1 Defendants are medical professionals. Furthermore, it is clear that evaluating the appropriateness of the decisions made and care provided by the Medic 1 Defendants involves medical judgment. Therefore, the Court finds that Plaintiff's state law tort claims fall within the scope of M.C.L. 600.2912b, and that Plaintiff's failure to follow medical malpractice procedure should result in summary judgment for the Medic 1 Defendants.

Furthermore, even if Plaintiff had complied with the special procedural requirements for medical malpractice claims, Defendants would still be entitled to summary judgment. The Emergency Medical Services Act ("EMSA") immunizes emergency medical personnel from liability for providing services to patients except for acts or omissions amounting to gross negligence or willful misconduct. M.C.L. 333.20965(1). For the purposes of the EMSA, "gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Junnings v. Southwood*, 446 Mich. 125, 136-37. Just as Plaintiff cannot establish "deliberate indifference" in support of his constitutional claims, Plaintiff fails to allege sufficient facts to survive judgment on a "gross negligence" theory. As discussed above, Plaintiff does not contest Medic 1 Defendants' account of the treatment provided to Doyle Jackson in the jail sally port. Plaintiff merely argues that the correct treatment was immediate transport to the nearest hospital. At most, this amounts to

a claim of ordinary negligence, and does not show a "substantial lack of disregard" for Doyle Jackson's well-being. Nor can Plaintiff show an intentional infliction of emotional distress by Medic 1 Defendants, as Doyle Jackson was never conscious in their presence.

### IV. Conclusion

Plaintiff bases his claims and arguments against Medic 1 Defendants on his position that Medic 1 Defendants should have immediately transported Doyle Jackson to the nearest hospital upon receiving him. Even assuming, as the Court must, that Plaintiff is correct, Plaintiff has not alleged a viable constitutional violation. With respect to his tort claims, Plaintiff has not followed mandatory procedure for a medical malpractice claim, nor has he alleged facts sufficient to overcome the immunity granted to emergency medical personnel under the EMSA. Accordingly, summary judgment will be granted in favor of Medic 1 Defendants.


Dated: September 30, 2011     /s/ Robert Holmes Bell
                              ROBERT HOLMES BELL
                              UNITED STATES DISTRICT JUDGE

14