UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES DARNELL JACKSON, as Personal
Representative of the Estate of Doyle M.
Jackson, Deceased,

       Plaintiff,

v.

BENTON HARBOR POLICE OFFICER JIM
WILKINS, et al.,

       Defendants.
_____/

File No. 1:09-cv-553

HON. ROBERT HOLMES BELL

# **O P I N I O N**

There are three sets of defendants in this case, each of which filed for summary judgment. (Dkt. Nos. 95, 115, 120.) In a prior opinion, the Court granted the Medic One Defendants' motion for summary judgment on all of Plaintiff's claims. (Dkt. No. 161.) The Court will now decide the motions for summary judgment filed by the Benton Harbor Defendants (Dkt. No. 120) and Berrien County Defendants (Dkt. No. 115).

### **I. Background**

At approximately 4:00 a.m. on May 29, 2007, Benton Harbor police were dispatched to the residence of Imogene Wade. Ms. Wade had called the police after Doyle Jackson had physically assaulted her and locked her out of her house. Benton Harbor Police Officers Dustin Blaskie and Jim Wilkins arrived at the scene. Officer Wilkins heard Ms. Wade yell that Jackson was stealing her vehicle. Jackson began to exit the driveway in the vehicle, and Officer Wilkins attempted to block him with his patrol

vehicle.  Jackson was able to maneuver past Wilkins' vehicle, and the officers began to pursue Jackson.  Jackson eventually lost control of his vehicle and slammed into a curb.

Jackson then exited the vehicle; it is disputed whether or not he had his hands up.  Officer Wilkins approached Jackson with gun drawn and shouted verbal commands at Jackson to get on the ground.  Jackson did not comply and approached Officer Wilkins.  At this point, Officer Wilkins claims that Jackson tried to grab his gun and shoved him.  Plaintiff claims that Jackson did not go for Wilkins' gun and that Wilkins took an unprovoked swing at him.  Video footage from Officer Wilkins' vehicle camera covers the car chase and this incident, though the parties interpret the footage differently.  At any rate, Jackson began to flee once again after coming into contact with Officer Wilkins, this time on foot.

Officer Blaskie, now also on foot, closed to approximately 15-20 feet behind the fleeing Jackson, and then fired his Taser.  Blaskie is unsure whether one, both, or neither of the Taser prongs made contact with Jackson.  However, nearly simultaneously with the Taser discharge, Jackson hit the side of a dumpster with enough force to cause a "back flip." (Dkt. No 132 at 3.)  Plaintiff alleges that Jackson was "propelled" into the dumpster protrusion by the shock of Officer Blaskie's Taser.  (*Id.* at 3-4.)  After making contact with the dumpster, Jackson got up and once again began running.

Soon after, Officer Blaskie caught Jackson and attempted to drive stun him.[1]  Then

---

[1] A "drive stun" involves placing a Taser directly against a target rather than firing the Taser's projectiles.  Drive stuns generally cause pain without incapacitating the target.

2

Officer Wilkins arrived. Plaintiff and Defendants present differing accounts of the struggle that took place, though the only witness accounts available of the struggle are from Officers Blaskie and Wilkins. What is undisputed is that Blaskie at least attempted to drive stun Jackson, that Wilkins struck Jackson with several blows,[2] and that Wilkins then fired his Taser while Jackson was on his hands and knees trying to get up. (Dkt. No. 120 at 4; Dkt. No. 132 at 4.) The Officers claim that Jackson was very strong, and resisted intensely until he was finally subdued by several pulses from Wilkins' Taser. Plaintiff argues that the officers used excessive force against an unarmed man who was down.

Officer Preston Alsup soon arrived on the scene. The Officers placed Jackson in Alsup's patrol car. They noted that Jackson did not appear able to walk on his own, and that he had scrapes and a bruise on his chest. Defendants claim that the officers asked Jackson if he wanted to go to a hospital, and that Jackson declined. The Officers then transferred Jackson to Officer Wilkins' patrol vehicle and searched the Wade vehicle for weapons or contraband. The Officers drove Jackson to the Berrien County Jail.

En route to the jail, Jackson defecated in Wilkins' vehicle. He also appeared lethargic upon arrival at the Jail at 5:06 AM. He had to be carried/dragged to his cell, and asked to be placed on a toilet. The Berrien County deputies who moved Jackson claim

---

[2] Defendants maintain that the officers used peroneal knee kicks and brachial punches, which are blows designed to temporarily incapacitate an opponent. (Dkt. No. 120 at 4.) Plaintiff insinuates that the blows may have been more savage and could be responsible for the testicular contusion discovered at Jackson's autopsy. (Dkt. No. 132 at 4.)

that they interpreted Jackson's failure to walk on his own power as typical drunken and unruly behavior. (Dkt. No. 116 at 4.)

For the better part of an hour, Jackson alternated between sitting on the cell toilet and lying on the floor. (*Id.* at 4-5.) During this time, Berrien County deputies and Nurse Mark Haueisen checked on Jackson sporadically. (*Id.*) Also during this time, Jackson vomited and defecated while off the toilet.

Upon suggestion that Jackson be taken to the showers to clean up, Nurse Haueisen entered Jackson's cell to help clean up and perform a medical assessment at 6:13 AM. Nurse Haueisen used smelling salts in an attempt to revive Jackson, and determined that Jackson was less responsive than at arrival. Nurse Hausen and Lt. Wilkey exited Jackson's cell at 6:19, and placed a call to Medic One for an ambulance at 6:23. (*Id.* at 6.)

A Medic One ambulance manned by Paramedic John VanHare and EMT Jessy Peterson arrived at the Berrien County Jail at 6:29 and reached Jackson's cell at 6:33. (Dkt. No. 95 at 6.) Jackson was placed on a gurney and transported to the ambulance waiting at the sally port. He was placed into the ambulance at 6:42. (Dkt. No. 106 at 3.) However, the ambulance did not leave the sally port until 7:13, a full half hour after Jackson was placed in the vehicle. (*Id.*) The Medic One defendants provided medical assistance during this period, including administration of an "Ambu-bag" to ventilate Jackson, placement on an EKG, and medication to treat "pulseless electrical activity" in

4

Jackson's heart. When the ambulance left for the hospital at 7:13, VanHare and Peterson had a Berrien County deputy drive the vehicle so that they could continue to work on Jackson.

Jackson arrived at Lakeland hospital at 7:18 AM. He was pronounced dead at 9:40 AM. Cause of death was a lacerated liver, presumably the result of Jackson's collision with a dumpster during his flight from the Benton Harbor police.

## II. Standard of Review

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendant carries his burden of showing there is an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v.*

*Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III. Benton Harbor Defendants

**A. Excessive Force**

Plaintiff claims that Benton Harbor Police Officers Blaskie and Wilkins violated Doyle Jackson's fourth amendment right to be free from excessive force during arrest. The use of excessive force by police officers in the exercise of their authority may give rise to a § 1983 cause of action. *Tennessee v. Garner*, 471 U.S. 1 (1985). Defendants, however, have raised the defense of qualified immunity.

The Supreme Court has held that "governmental officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Police officers in particular are entitled to qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that the officer's conduct was lawful; but if officers of reasonable competence could disagree on this issue, immunity

should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"[A]lthough the qualified immunity analysis is objective, the reasonableness of the officer's action must be evaluated in light of the information that the defendant officer possessed at the time of the act . . . ." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect pose(d) an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight.'" *Gaddis v. Redford Township*, 364 F. 3d 763, 772 (6th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  This reasonableness analysis allows "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 397.

Plaintiff argues that physical strikes and tazing used by Blaskie and Wilkins to subdue Jackson were unreasonable because the officers ignored information indicating that Jackson posed no safety threat.

> Defendants deduced that Plaintiff's inability to move, involuntary loss of bowel and sudden lethargy were caused by Blaskie's taser driving the Plaintiff into the dumpster handle.  The defendants ignored this information. . . .  If a jury determines that Defendants' conduct in ignoring the information known to them, along with Plaintiff's symptoms, was unreasonable, then the Defendants' actions were legally unreasonable under the 4th and 14th Amendment.

7

(Dkt. No. 132 at 16-17, 19.) This line of reasoning is defective. Jackson's injuries were the *result* of the officer's use of force, and thus cannot be used in support of Plaintiff's theory that Jackson was too injured to pose a safety threat at the time the officers employed that force.

Additionally, Plaintiff mischaracterizes the force used as "deadly force." (*Id.* at 17.) Although Jackson's injuries resulted in death, his impact with a dumpster and the resulting laceration of his liver were not intended or foreseeable. The officers employed a tazer, peroneal knee kicks and brachial punches to subdue Jackson, none of which are generally considered lethal.

Although there are disputes concerning the number of drive stuns employed by the officers and whether or not the initial taze "propelled" Jackson into the dumpster, a number of facts and circumstances are clear. Jackson was under suspicion of domestic violence and car theft. It is undisputed that Jackson fled from police, both by vehicle and on foot. It is also clear from squad car video that, at the conclusion of the car chase, Jackson exited his vehicle and approached Officer Wilkins — who had his gun drawn and pointed — ignoring Wilkins' yelled instructions to get on the ground. (Dkt. No. 132, ex. 4.) The video also shows Jackson unsuccessfully attempt to grab Wilkins' gun before fleeing. (*Id.*)

Under these circumstances, it cannot be said that "no reasonably competent officer would have concluded that the officer's conduct was lawful." *Malley v. Briggs*, 475 U.S.

at 341. Accordingly, Officers Wilkins and Blaskie are entitled to qualified immunity and summary judgment on Plaintiff's claims pertaining to use of excessive force. Officer Alsup, Chief Mingo, and the City of Benton Harbar are also entitled to summary judgment on Plaintiff's § 1983 claims, as Plaintiff has not established any underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

### B. Medical Care

Plaintiff also claims that the Benton Harbor Defendants violated his constitutional rights by failing to provide timely medical care. To establish a cognizable constitutional claim for failure to provide adequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Benton Harbor defendants again assert qualified immunity and move for summary judgment.

The "deliberate indifference" standard has both an objective and a subjective component. *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005). The objective component of a claim of deliberate indifference requires a medical need that is "sufficiently serious." *Id.* (citing *Farmer v Brennan*, 511 U.S. 825, 834 (1994)). Clearly, the circumstances of this case satisfy that prong. However, the subjective standard requires Plaintiff to allege facts showing that a defendant subjectively perceived facts from which to infer a substantial risk to the prisoner, that he did in fact draw the

9

inference, and that he then disregarded that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). As Plaintiff acknowledges, this test is "onerous." *Id.*; (Dkt. No. 106 at 13). Upon careful review of the record, the Court finds that Plaintiff has not met his burden of presenting evidence that any of the Benton Harbor Defendants were aware that Mr. Jones had a serious medical condition when he was in the custody of the Benton Harbor officers.

Plaintiff relies on observations by Officers Wilkins and Blaskie that Jackson required assistance in getting into the police vehicle after being subdued, and that he had suffered injuries. Plaintiff also relies on the fact that Plaintiff defecated in the police vehicle en route to the jail. However, this evidence does not support a finding that the Benton Harbor officers were "aware of facts from which the inference could be drawn that a substantial risk of serious medical harm exist[ed], and . . . that one or more of the officers actually drew that inference." *Farmer*, 511 U.S. at 837.

The visible injuries sustained by Jackson - scrapes and a bruise - were not plainly indicative of life-threatening condition. Jackson's difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back. Finally, the officers' decision to transport Jackson to jail rather than to a hospital was made prior to his defecation in the police vehicle.

The Benton Harbor police officers made a decision to transport an uncooperative arrestee directly to jail, knowing that the jail would have a nurse and medical clinic. Jackson himself stated that he did need to go to a hospital. While the officers knew that Jackson had suffered superficial injuries from their use of non-lethal force, there is no evidence that the officers knew or could have known that Jackson had suffered a life-threatening injury. The seriousness of Jackson's condition was arguably more apparent by the time the officers arrived at the Berrien County jail, but the Benton Harbor officers were told by nurse Haueisen that "[i]f he needs to go to the hospital, we'll take care of it." (Dkt. No 132 at 9.)

On these facts, it cannot be said that no reasonably competent officer would conclude that the Benton Harbor officers' decision to transport Jackson directly to jail would be a violation of his constitutional rights. Accordingly, the Benton Harbor Defendants are entitled to qualified immunity and summary judgment on all claims pertaining to their alleged failure to provide medical care.

**C. State Law Claims**

In addition to his constitutional claims, Plaintiff seeks relief under state law theories of intentional infliction of emotional harm, assault and battery, and gross negligence. Defendants assert that these claims are barred under Michigan's statutory wrongful conduct rule, Mich. Comp. Laws § 600.2955b:

> (1) Except as otherwise provided in this section, the court shall dismiss with prejudice a plaintiff's action for an individual's bodily injury or

> death and shall order the plaintiff to pay each defendant's costs and actual attorney fees if the bodily injury or death occurred during 1 or more of the following:
> > (a) The individual's commission, or flight from the commission, of a felony.
>
> (2) If the bodily injury or death described in subsection (1) resulted from force, the court shall not apply subsection (1) to the claim of the plaintiff against a defendant who caused the individual's bodily injury or death unless the court finds that the particular defendant did either of the following:
> > (a) Used a degree of force that a reasonable person would believe to have been appropriate to prevent injury to the defendant or to others.
> > (b) Used a degree of force that a reasonable person would believe to have been appropriate to prevent or to respond to the commission of a felony.

Plaintiff's state law claims are indeed based on an injury (ultimately resulting in death) that was sustained by Mr. Jackson during flight from the commission of a felony. It is undisputed that Jackson fled from police in Ms. Wade's vehicle, a felony violation of Michigan's "fleeing and eluding" statute. Mich. Comp. Laws § 750.479a. The Court also finds that Jackson was resisting arrest by ignoring Officer Wilkins' shouted command to get down on the ground, a violation of § 750.81d. Finally, Jackson may have been engaged in car theft. Although Jackson died before he could be charged with any of these felonies, the statute does not require a conviction.

Because Plaintiff's injury likely resulted from Officers Wilkins and Blaskie's use of force, the Court must also determine whether a reasonable person would believe that the degree of force was appropriate to prevent injury or to respond to the commission of a felony. For the reasons discussed in Part III.A, the Court finds that the non-lethal force

applied by the officers was an appropriate response to Jackson's flight from arrest. Accordingly, Plaintiff's state law claims are barred by § 600.2955b.

### IV. Berrien County Defendants

#### A. Medical Care

Plaintiff also claims that the Berrien County Defendants were deliberately indifferent to his serious medical needs. As discussed above, the subjective component of the deliberate indifference standard requires Plaintiff to demonstrate that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Berrien County Defendants assert qualified immunity and maintain that Plaintiff fails to show deliberate indifference with respect to any of the Berrien County officials.

Plaintiff argues that Deputies R. Uhrik, J. Uhrik, and Bundy, Lt. Wilkey, and Nurse Haueisen should have inferred from Jackson's symptoms — including his alleged inability to walk unassisted, uncontrolled defecation, and incoherence — that Jackson was suffering from a serious medical condition. (Dkt. No. 136 at 13.) However, the deliberate indifference standard requires Plaintiff to go further and present evidence that Berrien County Defendants actually *did* make such an inference. *Farmer*, 511 U.S. at 834 ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a

13

'sufficiently culpable state of mind.'") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Although a court may infer from evidence and circumstances that a defendant had the requisite state of mind, *Philips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008), Plaintiff has not presented sufficient evidence to support such a finding in this case. Indeed, at times Plaintiff's own brief and characterizations of the Berrien County Defendants' actions and deposition testimony underscore the deficiency:

> [Deputy Bundy] was unable to communicate with Doyle because he was "in and out" and "appeared to be extremely intoxicated;" but [Bundy] did nothing to determine whether Doyle was intoxicated or in a state of near-death.
> . . . .
> [Lt. Wilkey] never decided that Doyle needed to be transported for medical attention. He relied on Nurse Mark Hauesien's determination that 'since Doyle was still moving, he must be okay and didn't need medical help.' . . . Wilkey knew that Doyle had defecated in the cell, but didn't believe that meant there was anything wrong.

(Dkt. No. 136 at 6, 8.) Even assuming for the purposes of this motion that all of the individual Berrien County Defendants were aware of Doyle Jackson's symptoms, they could easily have believed that Jackson was merely suffering from heavy intoxication. While it was apparent that Jackson had superficial injuries and was in an altered state of consciousness, his behavior appeared to be consistent with drunkenness, and there is insufficient evidence to infer that any of the Berrien County Defendants reached the subjective conclusion that Jackson was suffering from a serious medical condition prior to the medical assessment performed at 6:13 a.m.

14

Plaintiff relies on the unreported case *Preyor v. City of Ferndale*, 248 F. App'x 636 (6th Cir. 2007), where the court held that a jury could find that officers ignored the serious medical condition of a man who had exhibited signs of detoxing from heroin, including excessive vomiting and diarrhea. (Dkt. No. 136 at 12.) However, this case is clearly distinguishable, as the decedent in *Preyor* repeatedly informed the defendants that he was suffering from heroin withdrawal and was held while exhibiting symptoms for over sixteen hours. Here, there was no such clear notice regarding Jackson's injury, and he was held for approximately one hour before an ambulance was called. Additionally, Jackson's lacerated liver was an unusual internal injury which, unlike heroin withdrawal, would not be familiar to jail personnel.

Plaintiff must do more than make a colorable showing of simple negligence. The deliberate indifference standard requires a showing that defendants ignored a serious medical condition despite subjective knowledge of a substantial risk of harm. Plaintiffs have not met that burdensome standard. Accordingly, the Berrien County Defendants are entitled to qualified immunity and summary judgment on Plaintiff's § 1983 claims derived from an alleged failure to provide medical care.

**B. Gross Negligence**

Under Michigan law, government officials are immune from tort liability so long as their conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c). "Gross negligence" is defined

as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

As discussed above, Plaintiff has not shown that the Berrien County Defendants were aware of Plaintiff's serious medical condition. Defendants cannot exhibit "substantial lack of concern" regarding a preexisting internal injury of which they were unaware. Accordingly, the Berrien County Defendants are also entitled to qualified immunity and summary judgment on Plaintiff's gross negligence claim.

**C. Intentional Infliction of Emotional Distress**

The tort of intentional infliction of emotional distress consists of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Ross v Barnes*, 612 F2d 271, 273 (6th Cir. 1980). Additionally, liability has been limited to circumstances "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603 (1985) (quoting Restatement Torts, 2d, § 46, comment g, p. 76).

Once again, the lack of evidence that any of the Berrien County Defendants had knowledge of Jackson's serious medical condition is fatal to Plaintiff's claim. Lacking knowledge of a serious medical condition, the Berrien County Defendants' failure to

immediately send Jackson to a hospital cannot be characterized as outrageous, nor can they be fairly charged with intent or recklessness in causing emotional distress.

### V. Conclusion

The Court finds that both the Benton Harbor and Berrien County Defendants are entitled to qualified immunity and summary judgment on all of Plaintiff's § 1983 claims. The Berrien County Defendants are also entitled to qualified immunity with respect to Plaintiff's claim of gross negligence and summary judgment on Plaintiff's claim of intentional infliction of emotional harm.  Plaintiff's state law claims against the Benton Harbor Defendants are barred by Mich. Comp. Laws § 600.2955b.  Accordingly, the motions for summary judgment filed by the Benton Harbor Defendants (Dkt. No. 120) and Berrien County Defendants (Dkt. No. 115) will be granted.  An order consistent with this opinion will be entered.


Dated: March 28, 2012                                /s/ Robert Holmes Bell
                                                                           ROBERT HOLMES BELL
                                                                           UNITED STATES DISTRICT JUDGE